UNITED STATES of America, Plaintiff,

v.

William STEPHENSON, Kathline Marria, Wendy Courech, Timothy Greening, Rudolpho Longo, Robert Vukson and Orville Walters, Defendants.

Crim. A. No. 78–80788.

United States District Court,
E. D. Michigan, S. D.

Oct. 22, 1979.

See also, D.C., 490 F.Supp. 619.

James K. Robinson, U.S. Atty., Samuel C. Damren, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

Kenneth M. Mogill, Philip F. Colista, Detroit, Mich., for defendants.

MEMORANDUM OPINION REGARDING MOTION BY DEFENDANTS, WILLIAM STEPHENSON, KATHLINE MARRIA AND WENDY COURECH, TO INVALIDATE THE ARREST WARRANT, SUPPRESS EVIDENCE AND DISMISS THE INDICTMENT

JULIAN ABELE COOK, Jr., District Judge.

This case charges conspiracy to possess with intent to distribute, to distribute and to manufacture, phencyclidine (PCP) in violation of 18 U.S.C. §§ 841(a)(1) and 846 (1975). There are also six ancillary substantive counts in the Indictment. The Motion before the Court challenges the sufficiency of the arrest and search warrants and affidavits appertaining thereto. The claim is that there was not sufficient probable cause to issue these warrants and that they are, therefore, defective under minimal Fourth Amendment standards as announced in *Aguilar v. Texas*,[1] and *Spinelli v. United States*.[2]

1. 378 U.S. 107, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

2. 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**FACTS**

The current Indictment supercedes a prior Indictment in Case No. 78–80590, the case pursuant to which the warrants in question were issued.

Special Agent Patrick Mueller filed a Complaint on August 8, 1978, charging the Defendants, Stephenson, Marria, Courech, Greening, Vukson and Longo with conspiracy to possess with intent to distribute, to distribute and to manufacture or attempt to manufacture PCP. That Complaint is appended to this Opinion. On the same day, and pursuant to that Complaint, the Honorable Chris E. Stith, a Magistrate of this District, signed arrest warrants for Defendants Stephenson, Marria, Courech, Vukson and Longo. The file does not reflect that a warrant for the arrest of Defendant Greening was issued, and the reason for such is unknown to the Court. The United States Marshal's Service, apparently accompanied by D.E.A. agents, executed these warrants on the next day, August 9, 1978.

These arrest warrants were executed on the three challenging Defendants, Stephenson, Marria and Courech at 6297 Washburn Road, Goodrich, Michigan (the home of these Defendants). The affidavit submitted in support of these warrants was the Complaint referred to above. The Defendants allege that (1) from the face of the Complaint, there were not sufficient facts to justify the issuance of the arrest warrants, and (2) *arguendo*, the Complaint did aver sufficient facts to justify issuance of the arrest warrants, the Court must nevertheless invalidate those warrants because the averments were made with knowledge of their falsity or in reckless disregard for the truth.

When the arrest warrants were executed at the Washburn Road address, the Defendants claim several officers seized items which were not in plain view and justified such seizures on the ground that the items were in "open view." The Defendants further claim that these seizures were the products of a general exploratory search.

After the arrests, Agent Mueller sought and obtained a search warrant for the 6297 Washburn residence from the Honorable Warren F. Kraphol, the Federal Magistrate located at Flint. The warrant was issued to search for "narcotics, narcotics paraphernalia, books, records, chemicals, glassware, precursors relative to the illicit manufacture of phencyclidine and other controlled substances which are in violation of Title 18 U.S.C. § 841(a)(1)." The affidavit in support of that search warrant is also appended to this opinion. Mueller reiterated many of the averments made in the Complaint.[3] He also stated that, when the arrest warrants were executed, the following items were in "open view": (1) plastic bags containing a leafy substance looking like marijuana; (2) job cigarette papers, which are often used in rolling marijuana cigarettes; and (3) two chemicals known to be precursors to the manufacture of PCP.[4]

The Defendants challenge this search on multiple grounds: (1) the items mentioned in ¶ 2 of the Affidavit were not, in fact, in "open view" when the arrest warrants were executed; (2) the warrant was not supported by probable cause because (a) the items mentioned in ¶ 2 were not sufficient in themselves to justify issuance of a warrant and because (b) the other averments (¶¶ 1, 3–10) were not sufficient to justify issuance of a warrant since such were insufficient to justify issuance of the arrest warrants; (3) *arguendo*, the affidavit was sufficient on its face, the items seized pursuant to the warrant must be suppressed because the averments were made with knowledge of their falsity or in reckless disregard for the truth.

When Mueller executed the search warrant at Washburn, he claims to have found a driver's license bearing the name of Janet Barber in the bedroom of Defendant Courech, and also a note on a calendar in that room which read "rent due on garage on Dort." He then proceeded to a garage located at G–51805 Dort Highway in Grand

---

3. Washburn Search Affidavit ¶¶ 1, 4, 6–10.

4. *Id.* at ¶ 2.

Blanc, Michigan and determined from the garage manager that a storage unit A–12 was being rented by a Janet Barber. Mueller went to the place where the unit was located and smelled chemicals. Subsequent to this, he sought, and obtained, a search warrant for storage unit A–12.

The affidavit in support of this search warrant reiterated the same averments as the Washburn warrant, ¶¶ 1–10 of the Dort storage bin affidavit being identical to ¶¶ 1–10 of the Washburn affidavit.[5] Additionally, ¶¶ 11–15 of the Dort storage bin affidavit related the facts capsulized above regarding the driver's license and subsequent events. The Dort affidavit is appended to this opinion.

The Defendants state that the affidavit is insufficient for the same reasons that the Complaint and the Washburn affidavit were defective. They also allege that the items seized were fruits of a poisonous tree and, thereby, inadmissible under *Wong Sun v. United States,*[6] and its progeny.

## ARREST WARRANTS

■ Let us look first to the challenge made by the Defendants to the arrest warrants. The procedure for obtaining an arrest warrant is outlined in Federal Rules of Criminal Procedure.[7] Cases regarding the sufficiency of search warrants as to probable cause are clearly analogous to situations where the sufficiency of an arrest warrant is in question. The Constitution makes no distinction between arrest and search warrants. It simply provides, "no warrants shall issue but upon probable cause supported by oath or affirmation and particularly describing the person or things to be seized."[8]

The Complaint in this case contains statements made by unidentified informants. The challenge to the warrants, therefore, clearly comes within the purview of *Aguilar v. Texas.* The Court granted *certiorari* in *Spinelli v. United States,*[9] to further explicate *Aguilar. Aguilar,* read in conjunction with Justice Harlan's opinion in *Spinelli v. United States,*[10] has established criteria for determining if minimal constitutional standards have been met when the affidavit contains hearsay information from tipsters. Although both *Aguilar* and *Spinelli* involved challenges to search warrants, courts have consistently applied their teaching to similar claims directed at arrest warrants.[11]

*Aguilar* held that to pass minimal constitutional muster, an affidavit must reflect (1) some underlying circumstances from which the informant could make the claim and (2) some underlying circumstances from which the affiant (law enforcement official) could conclude that the unidentified infor-

---

**5.** All of those averments also appeared in the Complaint, save ¶ 2, 4, & 5.

**6.** 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**7.** If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed . . . it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it . . . .
Fed.R.Crim.P. 4(a).

**8.** U.S.Const. amend. IV. *See Giordenello v. United States,* 357 U.S. 485–486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); *McGrain v. Daugherty,* 273 U.S. 135, 154–57, 47 S.Ct. 319, 71 L.Ed. 580 (1927); *Ex Parte Burford,* 7 U.S. (3 Cranch) 448, 2 L.Ed. 495 (1806). *See also United States v. Watson,* 423 U.S. 411, 429, 96 S.Ct. 820, 46 L.Ed.2d 598 (1975) (Powell, J., concurring); *United States v. Broward,* 594 F.2d 345, 348–50

(2nd Cir. 1979); *United States v. Evans,* 574 F.2d 352, 354–55 (6th Cir. 1978).

**9.** 390 U.S. 942, 88 S.Ct. 1025, 19 L.Ed.2d 1130 (1969).

**10.** 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**11.** *See, e. g., United States v. Boyce,* 594 F.2d 1246, 1249 (9th Cir. 1979); *United States v. Broward,* 594 F.2d 345, 348–50 (2nd Cir. 1979); *United States v. Salliey,* 360 F.2d 699, 703 & n. 3 (4th Cir. 1966); *Pugh v. Rainwater,* 422 F.Supp. 498, 501 (S.D.Fla.1976). *See also Whiteley v. Warden,* 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Schiffman,* 572 F.2d 1137, 1141 (5th Cir. 1978); *United States v. Darensbourg,* 520 F.2d 985, 992 (5th Cir. 1975) (Godbold, J., dissenting); *Weeks v. Estelle,* 509 F.2d 760, 763–65 (5th Cir. 1975); *Singleton v. Estelle,* 492 F.2d 671, 675 (5th Cir. 1974).

mant was "credible" or his information "reliable."

> Although an Affidavit may be based on hearsay information and need not reflect the direct personal observation of the Affiant . . . [1] the Magistrate must be informed of some underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and [2] some of the underlying circumstances from which the officer concluded that the informant whose identity need not be disclosed . . was "credible" or his information "reliable." [12]

Justice Harlan coined this the "two-pronged" test of *Aguilar* in *Spinelli* [13] and it is often referred to as such by lawyers and judges.

*Spinelli* held that, although an affidavit might not meet the requirements of *Aguilar*, it still could be constitutionally viable in light of other averments in the affidavit which corroborate the information received from the informant. In considering the corroborative averments, however, the *Aguilar* standard must be considered by the reviewing Magistrate or Judge. To wit, "[h]e must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* test without independent corroboration?" [14]

The issue before the Magistrate, therefore, was whether the Complaint signed by Patrick Mueller on August 8, 1978, was sufficient to establish probable cause that a conspiracy had been committed and that the named Defendants had committed that conspiracy.

The court will look at the first prong of *Aguilar* to determine whether the Magistrate was informed of underlying circumstances from which the informants concluded that certain acts had been committed, which, individually or in the aggregate, spelled the probable commission of a conspiracy. The following excerpts from the Complaint relevant to resolving that issue are reported below (the statements are arbitrarily numbered by the Court for future reference).

1. A cooperating individual *overheard* conversations between all Defendants except Robert Archie Vukson detailing an agreement between Defendants and their accomplices to build and operate an illicit laboratory designed to produce phencyclidine and located in the proximity of 841 Lake George, Oxford, Michigan.

2. A cooperating individual *observed* the actual lab being constructed and operated in 1975–1976 at the location by William Stephenson, Kathy Marria, Wendy Courech and Timothy Greening.

3. A cooperating individual later *observed* the lab being dismantled intact and prepared for transportation to another location.

4. A cooperating individual *heard* the Defendants state their intention to continue production of PCP.[15]

The Government simply asserts that, because all of these allegations were made from first hand or personal knowledge, the first prong of the *Aguilar* test has been satisfied. Recent Sixth Circuit authority buttresses this assertion. In *United States v. Lee*,[16] an unidentified informant indicated that he believed the Defendant had a large quantity of stolen property, including firearms, and narcotics. The affidavit indicated that the informant had seen firearms in the Defendant's home in her possession. The Sixth Circuit then spoke of the affidavit in question.

> Coming now to the affidavit before us and in interpreting it in a common sense and realistic fashion provided in *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct.

---

12. *Aguilar v. Texas*, 378 U.S. at 114, 84 S.Ct. at 1514.

13. *Spinelli v. United States*, 393 U.S. at 413, 89 S.Ct. 584.

14. *Id.* at 415, 89 S.Ct. at 588.

15. Complaint (emphasis supplied).

16. 581 F.2d 1173 (6th Cir. 1978).

741, 13 L.Ed.2d 684 (1965), we conclude that the personal observance of the informant of a large quantity of stolen property taken in residential burglaries in Ohio, and having personally seen the firearms in question, satisfied the requirements of *Aguilar* that some "underlying circumstances" must be shown by the informer.[17]

Other Circuits have held that first hand information satisfies the first prong of *Aguilar*.[18]

Nevertheless, it is important to point out that the *Lee* Court did not create a *per se* rule that the first prong of *Aguilar* is always satisfied when the face of the affidavit reflects that the informant's knowledge is first hand. Judge Keith filed a concurring opinion where he stated:

I would have preferred, however, a search warrant affidavit that fully set out the underlying circumstances which supported the informant's belief that the guns he saw at Lee's house were stolen, or that independent steps were taken by the agents to corroborate the informant's information.

．　　．　　．　　．　　．

Thus the statement in *Ventresca* that search warrants should not be read in an overly technical manner does not, I would suggest, apply to a situation where the affidavit is unclear as to how the informant obtained his information, and the affiant has not included any independent verification of the informant's information. (In this case, the agents did check the cars in front of Lee's house and established that she owned these vehicles but that was irrelevant to the probable cause issue of whether the guns were stolen or not. The fact that she owned the cars is consistent with innocent activity.) [19]

Similar to Judge Keith's concerns in *Lee*, I would like to have seen a more explicit explanation of the circumstances in which these personal observations were made. The Complaint makes reference to cooperating individuals, but there is an ambiguity as to the identity of the cooperating individual(s) who made the four statements above. If the individual(s) who made statements # 2 and # 3 is (are) a different person(s) from the individual who made statement # 1, then statements # 2 and # 3 could well be a reporting of innocent conduct because those statements make no reference to the laboratory being illicit. However, the admonition of *Ventresca* to read such statements in a common sense fashion would arguably apply here, since the inference seems sustainable that laboratory referred to in statements # 2 and # 3 is, in fact, the illicit lab referred to in statement # 1.

There are other problems ancillary to the personal knowledge of these cooperating individuals. No date is given as to when the cooperating individual overheard the conspiratorial conversations of statement # 1. No date is given as to when that (or another) cooperating individual observed the lab being dismantled in statement # 3, or when that (or another) cooperating individual heard the Defendants state their intention to continue production of PCP. Unlike the fresh information in *Lee*, it can only be assumed (especially with respect to statement # 1) that the conversations heard and observations made occurred several years ago. There is nothing in the Complaint which would indicate (1) where the informant overheard the discussion regarding the conspiratorial agreement, or (2) where the conversations relating to the intention of the Defendants to continue manufacturing PCP, were overheard.

The court is concerned about possible staleness of the incriminating declarations. In *United States v. Salvucci*,[20] the Court, in the context of discussing the staleness of information provided to obtaining a search warrant, said:

17. *Id.* at 1177.

18. *See, e. g. United States v. Valenzuela*, 596 F.2d 824, 828 (9th Cir. 1979); *United States v. Holmes*, 594 F.2d 1167, 1170 (8th Cir. 1979).

19. *United States v. Lee*, 581 F.2d at 1179–80 (Keith, J., concurring).

20. 599 F.2d 1094 (1st Cir. 1979).

The fatal defect in the present affidavit is that it does not disclose the date of the conversation overheard by the informant in which Zackular stated that the check-writer used to print forged checks was being kept at his wife's apartment in Melrose. Without this date, there was no way for the magistrate to determine whether the information was sufficiently timely to support the warrant.[21]

The Court made this finding notwithstanding recognition of the proposition "that where 'undated information is factually interrelated with other, dated information in the affidavit, then the inference that the events took place in close proximity to the date actually given may be permissible.' "[22] Such an inference is not sustainable here, there being no other related dates (other than the general reference in statement # 2 to operation of the labs in 1975–76) in the affidavit.

Nevertheless, the Court does not believe this to be an imperishable defect here because an arrest, and not a search warrant, is involved. When an informant's declarations indicate certain items to be seized are at a given place or on a given person, the possibility that such items may no longer be at the designated place or on the designated person increases with time. Contrastingly, once declarations establish there is a probability that a crime has been committed and the Defendant(s) has (have) committed it, staleness poses no problem, unless supple-

mental exculpatory information comes to the attention of the law enforcement official. Justice Powell made this observation in *United States v. Watson*.[23]

The probable cause to support issuance of an arrest warrant normally would not grow stale as easily as that which supports a warrant to search a particular place for particular objects. This is true because once there is probable cause to believe that someone is a felon the passage of time often will bring new supporting evidence. But in some cases the original grounds supporting the warrant could be disproved by subsequent investigation that at the same time turns up wholly new evidence supporting probable cause on a different theory. In those cases the warrant could be stale because based upon discredited information.[24]

Even the dissent in *Watson* acknowledged that staleness posed no problem in the arrest warrant context. "If anything, the virtual non-existence of a staleness problem suggests that such a requirement [i. e. to obtain a warrant] would be less burdensome for the police than the search warrant rule."[24a] There being no evidence before the Magistrate or the Court that the Agents obtained exculpatory declarations of the informants, it cannot be said those declarations were stale.[25]

Despite my discussion of the problems ancillary to satisfaction of the first prong of *Aguilar*, it would be singularly inappropri-

21. *Id.* at 1096.

22. *Id.*

23. 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1975).

24. *Id.* at 432 & n. 5, 96 S.Ct. at 832 (Powell, J., concurring).

24a. *Id.* at 452, 96 S.Ct. at 842 (Marshall, J., dissenting).

25. The Court would also make the following observation. The *Watson* case upheld the common-law and statutory power of law enforcement officials to execute a warrantless arrest in a public place when they have probable cause to believe that a person has committed or is committing a felony. *Id.* The Agents of the Drug Enforcement Administration have

been granted such arrest powers. 21 U.S.C. § 878(3)(B) (1975). To treat the arrest warrant here like a search warrant, i. e., as stale, could well inhibit the Drug Enforcement Administration from seeking arrest warrants and thereby encourage them to utilize their statutory prerogative under 21 U.S.C. § 878(3)(B), a practice which is frowned upon in this Circuit. *See United States v. Carriger*, 541 F.2d 545, 553 (6th Cir. 1976). Of course, a warranted arrest lacking probable cause would be as defective as a warrantless one. However, it would not be subject to the same exacting scrutiny. *Id.* The Drug Enforcement Administration Agents here did not exercise their prerogative under the statute but rather sought arrest warrants. By doing this, they followed the preferred practice.

ate to substitute my own judgment for that of the Magistrate.[26] This is not to say that his eventual finding of probable cause necessarily mandated that he find the first portion of the *Aguilar* test to have been satisfied. *Spinelli* permits a warrant defective under *Aguilar* to be salvaged by reference to corroborative facts *aliunde* the informant's declarations. Nevertheless, it is the conclusion of the Court that the Magistrate could have found (and, in all likelihood, did find) that the first prong of *Aguilar* was satisfied since the informant's(s') statements ( # 1–# 4) all stem from his/her (their) personal knowledge. This is an especially compelling conclusion in light of the *Lee* case.

This brings the Court to the second tine in the *Aguilar* analytic scheme. Namely, does the Complaint indicate some of the underlying circumstances from which Agent Mueller could conclude that the unidentified informant(s) was (were) credible or his/her (their) information reliable? The following are portions of the Complaint relevant to that inquiry: (Again, they are arbitrarily lettered by the Court for reference purposes).

A. None of the cooperating individuals were involved, to the knowledge of the affiant, in the criminal enterprise alleged.
B. The cooperating individuals are ordinary citizens who have been questioned by affiant.
C. None of the cooperating individuals are professional tipsters or members of the criminal millieu.[27]

The Government contends that the second tine of *Aguilar* can be satisfied either by the "status" of the informant, by his/her "track record" in giving reliable information on prior occasions, or by some admixture of the two. With this contention, the Court is in substantial agreement. Certainly, the cases are legion which hold that the second prong of *Aguilar* is satisfied when the affidavit contains a declaration that the informant has given accurate information on prior occasions.[28] More difficult problems arise with respect to affidavits which contain no "track record" declarations; i. e., with affidavits that attempt to satisfy the *Aguilar* second prong simply by reference to the status of the informant as a non-professional tipster. The leading case in this area, *United States v. Burke*,[29] was decided by the Second Circuit, Judge Friendly writing for the panel.

> [T]here has been a growing recognition that the language in *Aguilar* and *Spinelli* was addressed to the particular problem of professional informers and should not be applied in a wooden fashion to cases where the information comes from an alleged victim of or a witness of a crime.[30]

*Burke*, however, does not suggest a status oriented analysis which would find *Aguilar* satisfied (or inapplicable) when the informant can be characterized as a non-professional. Rather, the analytical focal point appears to be upon the words "should not be applied in a wooden fashion." The Court found that there existed a "substantial basis"[31] for the Magistrate to conclude the hearsay was credible since the affidavit evidenced that Thompson, the named informant, had been in the Defendant's bedroom and had seen the stolen firearm in question.

A few Circuits have explicitly held, and many have ventured to intimate, that *Aguilar-Spinelli* extends only to the professional informant problem.[32]

26. See note 84 *infra* & accompanying text.

27. Complaint.

28. *See, e. g., United States v. Holmes*, 594 F.2d 1167, 1170 (8th Cir. 1979); *United States v. Dudek*, 560 F.2d 1288, 1292 (6th Cir. 1977).

29. 517 F.2d 377, (2d Cir. 1975) (Friendly, J.).

30. *Id.* at 380.

31. The substantial basis language or standard arises out of *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and was quoted with approval in *United States v. Harris*, 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (plurality opinion of Burger, C. J.).

32. *United States v. Melvin*, 596 F.2d 492, 497 (1st Cir. 1979); (*Aguilar-Spinelli* not applicable to eyewitness instruction, but still must be

Some of the Circuits, including our own, have taken intermediate positions with respect to a rigorous application of *Aguilar-Spinelli* to the hearsay declarations of non-professional informants. Often the issue of holding *Aguilar-Spinelli* inapplicable to such fact-patterns is raised, and then avoided.[33] Also, the question has been raised and avoided by reference, as permitted by *Spinelli*, to the existence of corroborative facts *aliunde* the declarations of the informant.[34] In other instances, the necessity of addressing the question is eluded by stating the reviewing court must be deferential to the Magistrate (or the judicial officer who acted upon the warrant request) or by reference to a principle of construction that has become somewhat of a platitude in Fourth Amendment analysis of warrant affiants; i. e., the affidavit should not be read in a hypertechnical but rather in a common sense and realistic fashion.[35]

It is difficult to ascertain from these cases in just what circumstances *Aguilar-Spinelli* is inapplicable, satisfied, or diluted when the status of one who could be characterized as a non-professional informant, makes the challenged declarations. It would appear that these cases discuss several sub-categories of non-professionals: eyewitnesses, victims, identified and unidentified persons, private or ordinary citizens (perhaps as opposed to those informants with criminal records), uninvolved or innocent persons, and paid and unpaid persons. However, few of the opinions seriously differentiate these sub-categories or attempt to explain why they should be treated similarly. Consequently, a more basic difficulty lies when one attempts to glean some basic rationale underlying all of these cases, which can be used whenever concerns regarding an informant's status arise.[36]

"substantial" basis for crediting the hearsay); *United States v. McCrea*, 583 F.2d 1083, 1085 (9th Cir. 1978) (Court said it was reasonable to rely upon the good faith observations of these known private citizens); *United States v. Hunley*, 567 F.2d 822, 825 (8th Cir. 1977) (dicta to the effect that under certain circumstances, there may be "built in" credibility as to a victim or innocent eyewitness who gives his/her account of a crime); *United States v. Darensbourg*, 520 F.2d 985, 989 & n. 5, *modified on other grounds*, 524 F:2d 233 (5th Cir. 1975) (dicta that *Aguilar-Spinelli* may only apply to the professional informant situation); *United States v. McCoy*, 478 F.2d 176, 179 (10th Cir. 1973) (dicta that requirement of attestations in affidavit of credibility of informant or his information not apply when informant is eyewitness); *United States v. Bell*, 457 F.2d 1231, 1239 (5th Cir. 1972) (held: *Aguilar-Spinelli* applies only to [professional] informant situation); *McCreary v. Sigler*, 406 F.2d 1264, 1269 (8th Cir. 1969) (dicta stating "An informant who alleges he is an 'eye-witness' to an actual crime perpetrated demonstrates sufficient 'reliability' of the person.") *See also* cases collected in *United States v. Baker*, 577 F.2d 1147, 1149–50 & nn. 4–8 (4th Cir. 1978). *But see United States v. Darensbourg*, 520 F.2d at 989–92 (Godbold, J., dissenting).

**33.** *See, e. g., United States v. Swihart*, 554 F.2d 264, 268 (6th Cir. 1977); *United States v. Darensbourg*, 520 F.2d at 989.

**34.** *See, e. g., United States v. Baker*, 577 F.2d at 1149–50 & nn. 4–8, 1152; *United States v. Campbell*, 575 F.2d 505, 507 & n. 1 (5th Cir. 1978).

**35.** *See, e. g., United States v. Baker*, 577 F.2d at 1152; *United States v. Campbell*, 575 F.2d at 508; *United States v. Henley*, 567 F.2d at 828; *United States v. Swihart*, 554 F.2d at 269–70.

**36.** The Supreme Court granted *certiorari* in *United States v. Harris*, 397 U.S. 905, 90 S.Ct. 898, 25 L.Ed.2d 86 (1970), "to consider the recurring question of what showing is constitutionally necessary to satisfy a Magistrate that there is a substantial basis for crediting the report of an informant known to the police, but not identified to the Magistrate, who purports to relate his personal knowledge of criminal activity." *United States v. Harris*, 403 U.S. 573, 575, 91 S.Ct. 2075, 2078, 29 L.Ed.2d 723 (1971). *Harris* did little to unambiguously resolve, for the lower courts (1) the question presented, (2) the continued viability of *Aguilar-Spinelli*, or (3) under what circumstances the status of an informant relaxed or eliminated a rigorous application of *Aquilar-Spinelli*. The plurality opinion of the Court was delivered by the Chief Justice, Mr. Justice Stewart concurring in Part I, and Mr. Justice White concurring in Part III. Part II of the Opinion questioned portions of the *Spinelli* reasoning and concomitantly placed qualifications on that case. *See United States v. Burke*, 517 F.2d at 380. Note, *The Supreme Court, 1970 Term*, 85 Harv.L.Rev. 3, 63 & n. 55 (1971). Mr. Justice Black filed a concurring opinion, his being desirous to overrule both *Aguilar* and *Spinelli*. Mr. Justice Blackmun filed his own concurring opinion suggesting the Court overrule *Spinelli*. Mr. Justice Harlan filed a lengthy and vigorous dissent joined in by Messrs. Justices Douglas, Brennan and Marshall.

At odds in these situations, although seldom articulated as such, are two important concerns of Fourth Amendment policy. On the one hand we have a rule (*Aguilar-Spinelli*) which, if strictly applied, would preclude the police from using the declarations of eyewitnesses, innocent bystanders, victims, or other persons (who, in all likelihood, have had no prior contact with police agencies or officials) simply because the affidavit could not establish their information gathering performance on prior occasions. By contrast, there is a legitimate concern that an informant should not be afforded inherent credibility, and thereby have his/her declaration be considered reliable, simply by a talismanic characterization of this person as a non-professional. This is an especially cogent concern when the person is unidentified. For example, some unidentified person could be truthfully labelled as an ordinary or private citizen who is not a participant in the instant crime or part of the criminal milieu, but he/she could be serving in an investigative capacity for a long period of time as a paid informant.

How the Magistrate accords an acceptable tension between these apparently discordant and countervailing concerns must turn on the specific fact-pattern presented by the affidavit. There is consolation in the admonition that the *Aguilar-Spinelli* analysis must not be a severable endeavor, or a weighing of "individual layers," but rather should be a review of the "laminated total." [37] Additionally, for Magistrates who are charged with the arduous task of acting upon warrants under certain, and often specific, time constraints, and who must make these closely calibrated evaluations in such contexts, there is yet another proposition of comfort. Their judgments will only be set aside if found to be arbitrarily made.[38]

The Government does not suggest that a mere allegation of the non-professional status of an informant should result in their being considered inherently credible since, to date, the Sixth Circuit has not addressed this question. It does suggest, however, that *United States v. Swihart* [39] "has adopted a sliding scale view of inherent credibility" by choosing not to apply *Aquilar-Spinelli* in a wooden fashion. This point is well taken.

The *Swihart* Court said:

While we do not find it necessary to go so far as to limit strictly the *Aguilar-Spinelli* test to unidentified and/or professional informants, we are of the opinion that where, as here, the informant is an identified nonprofessional who is also the victim of the crime, the danger of casual rumor or irresponsible conjecture on the part of the informant is substantially diminished, and in assessing the probative value of the affidavit the magistrate and the reviewing courts should be all the more wary of applying—

. . . hypertechnical or rigorous standards which would frustrate the efforts of law enforcement officials

---

In dealing with *Harris*, Courts often pass over it and predicate their holdings on Supreme or Circuit Court case law antedating *Harris*. *See, e. g., United States v. Burke*, 517 F.2d at 380. *United States v. Swihart*, 554 F.2d at 268–69. Courts have also selectively utilized some portion of the *Harris* opinion to justify a given proposition or result. Cases from our own Circuit best exemplify this. *Compare United States v. Lee*, 581 F.2d at 1179 and 1180 (Keith, J., concurring) (making use of Justice Harlan's dissent in *Harris* and also making a qualified or cautious reference to Part II of the Chief Justice's plurality opinion), *with, United States v. Swihart*, 554 F.2d at 268 (reference made to various propositions appearing in Part II of Chief Justice Burger's plurality opinion). The inexorable conclusion that must flow from a review of the post-*Harris* cases decided in this, and other Circuits, is that *Harris* offers little light in ascertaining how to deal with declarations of non-professional informants. The Court is left, therefore, to the precedents of this Circuit (and with its own wits) to resolve the fact-specific problem presently before it.

37. *See United States v. Baker*, 577 F.2d 1147, 1151–52 (4th Cir. 1978); *United States v. Prince*, 548 F.2d 164, 165–66 (6th Cir. 1977); *Smith v. United States*, 123 U.S.App.D.C. 202, 206, 358 F.2d 833, 837 (D.C.Cir.), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1966).

38. *See* notes 76–89 *infra* & accompanying text.

39. 554 F.2d at 264 (6th Cir. 1977).

and actually prevent any enforcement of the firearms statute,

quoting from *United States v. Sevier*, 539 F.2d 599, 603 (6th Cir. 1976).

Moreover, in the case of the identified nonprofessional who is also a victim of the crime, the burden of satisfying the second prong of the Aguilar-Spinelli test that the informant was credible or his information reliable, is less stringent than in the case of the unidentified and/or professional informant.[40]

Although the Court's holding was premised on the declarant being a victim, the language fairly supports an inference that Magistrates can relax from a rigorous application of *Aguilar-Spinelli* when a non-professional is involved. Nevertheless, this language also, and perhaps more explicitly, suggests a healthy skepticism regarding un-identified informants (especially in view of its favorable citation of *United States v. Darensbourg*,[41] which drew the line "at ano-nymity" in its relaxation of *Aguilar-Spinelli*). However, from such language, I do not think it appropriate to leap forward and conclude that when an unidentified non-professional informant is involved, no relax-ation of *Aguilar-Spinelli* is permissible. I say this for several reasons.

First, "[i]t is a maxim, not to be disre-garded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."[42] In *Swihart*, the Court was not concerned with the problem faced here, i. e., the problem of an unidentified but never-theless, non-professional informant. It dealt rather with an identified victim.

Second, *Swihart* cites *Brown v. United States*,[43] which found an unidentified vic-tim's declarations as satisfying *Aguilar.*

Finally, the subtleties involved in balanc-ing the Fourth Amendment policies dis-cussed above preclude drawing any defini-tive line at anonymity. Clearly, a Magis-

trate should not be inhibited from consider-ing the declarations of a non-professional, victim or otherwise, merely because the in-formant, out of fear or self-preservation, wishes to remain unknown. When the in-formant is anonymous certainly the Magis-trate is forewarned that perhaps more should be forthcoming, but anonymity is only one of many factors that he/she might consider in deciding if the declarations are reliable and, ultimately, if probable cause exists.

Perhaps what was *not* in the Complaint should have caused, or did cause, Magistrate Stith to pause with respect to finding the declarations of these unidentified cooperat-ing individuals reliable. Since the Com-plaint does not delineate which one of the cooperating individuals made which state-ments, and since the various declarations appear to cover a period of several months, if not years, it would seem that a common sense reading more than fairly supports an inference that the Drug Enforcement Ad-ministration, in the course of its investiga-tion, maintained contact with these persons over a substantial period of time. Addi-tionally, there is nothing in the Complaint which would indicate that these persons were not compensated for providing such information, although the averment that they were not professional tipsters might give credence to such a conclusion.

In light of the cases cited and the discus-sion above, the Court cannot conclude that Magistrate Stith acted arbitrarily or im-properly. From the face of the Complaint, he knew that: (a) the cooperating individu-als were not, to the best knowledge of the affiant, involved in the instant crime; (b) they were ordinary citizens; (c) they were not professional tipsters; and (d) they were not part of the criminal milieu. The Magis-trate could have found that *some* indicia of inherent credibility might be afforded these persons in assessing the reliability of the

40.  *Id.* at 269.

41.  520 F.2d 985, 989, *modified on other grounds*, 524 F.2d 233 (5th Cir. 1975).

42.  *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821).

43.  125 U.S.App.D.C. 43, 365 F.2d 976, 979 (D.C. Cir.1966) (Burger, J.).

information provided by them. Moreover, it is unimportant whether this Court would have reached the same conclusion had it been presented with the Complaint. We do not review such matters *de novo.*[44]

As indicated earlier, the reliability of an informant can be established by reference in the affidavit or Complaint to his/her "track record." The Complaint, in this case, contains averments which, the Government argues, do this.

> All the cooperating individuals have supplied agents of the D.E.A. with intelligence concerning the above conspiracy and background on the individuals involved such as residence, vehicle ownership and use, criminal records, meetings between individuals, and the identity of their associates. This information has been independently corroborated through governmental agencies and found to be true.[45]

It is interesting that the Government has asserted that the cooperating individuals should be accorded some degree of inherent credibility due to their status as non-professional tipsters but then, alternatively, argues that these persons have provided reliable information on other occasions. This might be a factor that could work to diminish affording such persons inherent credibility. Also, unlike the "typical" track record situation, the information used to give an aura of reliability to the relevant declarations stems from the present case. Moreover, none of the information is dated and, therefore, it is difficult to ascertain if the "track record" information antedates or postdates the relevant declarations.

These last two problems obfuscate the analytical distinction between track record information and corroborative facts *aliunde* the declarations. Because the information to be utilized to show "track record" arises out of this investigation (as contrasted with a prior investigation), it has several characteristics of "corroborative evidence." The absence of identifying dates in the Complaint accentuates those characteristics. The corroborated intelligence of these cooperating individuals regarding the background of the Defendants (residence, vehicle ownership and use, meetings between individuals and identity of their associates) involves corroboration of innocent activity. In view of this, the Court would point out that there is a growing body of case law in this Circuit evidencing a deep skepticism regarding the justification of an informant's tip by reference to corroboration of innocent activity.[46]

A basic statement of the role that corroborative facts can play in justifying an informant's tip has been most adequately reported in *United States v. Baker*: [47]

> Under all the authorities, however, if the information detailed in the tip is verified or corroborated by other facts developed or acquired in the course of the arresting officer's investigation prior to arrest, which may be said to have "not only attested also to have supported the conclusion that his information has a reasonably substantial basis in fact," the information supplied by the tip may be a proper basis for a finding of probable cause.[10]
>
> [10] There is some contrariety in the decision on whether the corroborating facts may be "innocent facts" conforming to the information in the tip or must be facts which "relate directly to the criminal activity." [48]

In *Baker*, the Court went on to cite a long line of Second Circuit opinions upholding findings of probable cause predicated upon corroboration of innocent facts.[49] The *Baker* Court referred to *United States v. Larkin*,[50] as the leading case requiring a stricter standard. Apparently, the Ninth Circuit has retreated somewhat from *Lar-*

---

**44.** *See* note 84 *infra* & accompanying text.

**45.** Complaint.

**46.** *See* notes 54–66 *infra* & accompanying text.

**47.** 577 F.2d 1147 (4th Cir. 1978).

**48.** *Id.* at 1150 & n. 10.

**49.** *Id.* n. 10. *See, e. g., United States v. Jackson*, 560 F.2d 112, 121 (2nd Cir. 1977).

**50.** 510 F.2d 13, 15 (9th Cir. 1974).

*kin*, however.[51] The Fifth Circuit seems to have recently fallen into the "strict standard" camp,[52] although there were prior cases indicating that corroboration of a sufficient accumulation of innocent detail could result in finding the tip reliable.[53] *Baker* indicates that *Larkin* has been followed in a number of Sixth Circuit cases,[54] but I do not find the cases so easily categorized or reconciled one with the other.

For example, in *United States v. Craemer*,[55] the Court said:

> However, all the conduct observed by the agents was entirely consistent with inno-cent behavior, as such it cannot corroborate the information supplied by the informant and form the basis for a finding of probable cause.[56]

However, in *United States v. Edmond*,[57] the Court upheld a tip which was corroborated only as to innocent details. The majority distinguished *United States v. Jordan*,[58] on the ground that there the verification of the tip, as well as the tip itself, was insufficient.[59] Judge McCree (presently Solicitor General of the United States) filed a dissenting opinion relying in large part on *Jordan*.[60] Recently, in *United States v. Andrews*,[61] the Sixth Circuit has noted the difficulty in determining the type of conduct which must be corroborated in order to raise a deficient tip to probable cause levels.[62] The Court, after some discussion, then declined to define the "exact nature of the information which must be corroborated to warrant a probable cause determination" since that case involved application of a reasonable suspicion standard.[63]

This Court, in an attempt to reconcile *Edmond* and *Craemer*, believes that a sufficient quantum of corroborated details of a tip, albeit corroborative only of innocent conduct, could, in certain instances, arouse a Magistrate's suspicions enough to warrant probable cause.[64] (This is not to say that this Court would make such a determination if presented the question).[65] Other Circuits have read the Sixth Circuit opinions as focusing on the extent, rather than the nature of the corroboration.[66]

**51.** *See United States v. Jackson*, 544 F.2d 407, 411, 412 (9th Cir. 1976) (majority opinion and dissenting opinion of Hufstedler, J.).

**52.** *United States v. Rasor*, 599 F.2d 1330, 1332 (5th Cir. 1979); *United States v. McLeroy*, 584 F.2d 746, 748 (5th Cir. 1978).

**53.** *See, e. g., United States v. Montgomery*, 554 F.2d 754, 757, 758 (5th Cir. 1977); *United States v. Tuley*, 546 F.2d 1264, 1268 (5th Cir. 1976).

**54.** *United States v. Baker*, 577 F.2d at 1150–51 n. 10.

**55.** 555 F.2d 594 (6th Cir. 1977).

**56.** *Id.* at 597. *See also United States v. Jackson*, 533 F.2d 314, 318–19 (6th Cir. 1976); *United States v. Jordan*, 530 F.2d 722, 724–26 (6th Cir. 1976).

**57.** 548 F.2d 1256, 1256 (6th Cir. 1977).

**58.** 530 F.2d 722 (6th Cir. 1976).

**59.** *United States v. Edmond*, 548 F.2d at 1258.

**60.** *Id.* at 1260–61.

**61.** 600 F.2d 563 (6th Cir. 1979).

**62.** *Id.* at 568.

**63.** *Id.* at 569.

**64.** *See United States v. Andrews*, 600 F.2d at 568–69; *United States v. Edmond*, 548 F.2d at 1258. *See also United States v. Craemer*, 555 F.2d at 595, 597. *Craemer* involved corroborative efforts effectuated through use of the Drug Enforcement Administration drug courier profile—a practice that has been systematically scrutinized in this Circuit. *See e. g., United States v. Andrews*, 600 F.2d 564 & n. 1, 566–671; *United States v. Mendenhall*, 596 F.2d 706, 707 (6th Cir.), *cert. granted*, 444 U.S. 822, 100 S.Ct. 42, 62 L.Ed.2d 29 (1979); *United States v. Smith*, 574 F.2d 882, 883 & n. 1 (6th Cir. 1978).

**65.** I have indicated, on another occasion and in a different context, my skepticism about establishing the reliability of a declarant's statements by reference to independent verification that only goes to non-criminal activity. *United States v. Turner*, 475 F.Supp. 194 (E.D.Mich. 1978) (Order Denying Government's Motion to Admit Evidence of Sworn Written Statements and Grand Jury Testimony of an Unavailable Witness).

**66.** *United States v. Baker*, 577 F.2d 11, 1151 & n. 10 (4th Cir. 1978). *See also, United States v. Montgomery*, 554 F.2d 754, 757–58 (5th Cir. 1977), *cert. denied*, 434 U.S. 927, 98 S.Ct. 409,

Before getting into a full blown discussion of the corroborative portions of the affidavit involved here, however, the Court would note that the portion of the affidavit, which is presently under discussion, was proffered for the purpose of establishing a "track record." It was simply noted that the peculiarities incidental to this specific averment seemed to obfuscate the distinction between "track record" and "corroborative" averments. As the Ninth Circuit observed in *United States v. Jackson*,[67]

> [t]he fact that these verified bits did not relate directly to the criminal activity does not mean that such corroboration cannot support belief in her [the intended informant's] credibility. . . . Her reliability is further bolstered by the specificity of the tips she gave—the name [of the Defendant] "James," the phone numbers, the time the money left the house—which is not the kind of information likely to be passed around in rumors.[68]

*Jackson* indicates that corroborated facts, although innocent, could help to establish the credibility of the person who gives a tip, the incriminating portion of which is uncorroborated. This is a distinctly different inquiry from whether an insufficient tip under *Aguilar-Spinelli* can rise to the level of probable cause in view of independent corroboration. Therefore, the innocent/incriminating distinction has little relevance in this context.

The inquiry in assessing credibility and reliability revolves around the attempt "to negate the possibility that the informer 'fabricated his report out of whole cloth,'"[69] and also in preventing arrests based on no more "than idle rumor or irresponsible conjecture."[70] A Magistrate could reasonably conclude that an informant was credible if detailed facts were corroborated (albeit they involve reports of innocent conduct and are undated). The detailed and verified information here regarding the Defendant's residence, vehicles, meetings and associations certainly could have permitted the Magistrate to conclude that these persons were credible and that the incriminating information provided by them was therefore reliable. This would seem especially true in view of the very real possibility that the Magistrate could have found some degree of inherent credibility regarding such informants by virtue of their status as non-professionals. The Court therefore, does not believe it would have been unreasonable for the Magistrate to find that the second tine of *Aguilar* was satisfied by the averments made in the Complaint.[71]

In an effort to supplement its arguments that the Complaint was supported by probable cause, the Government contends that, *arguendo*, the Complaint was insufficient under *Aguilar*, there are sufficient corroborative facts averred in the Complaint to salvage the tip.

The following are excerpts taken from the Complaint upon which the Government relies to justify this argument. (The various averments are arbitrarily numbered for reference purposes).

(i) [T]hat in Detroit, Michigan in March of 1975, Rudolph Longo purchased large quantities of known chemical precursor to the production of PCP.

(ii) [I]n June of 1976, Robert Archie Vukson and Rudolph Longo purchased and transported large quantities of chemical precursor from Chicago to Detroit.

54 L.Ed.2d 285 (1978); *United States v. Larkin*, 510 F.2d 13, 15 (9th Cir. 1974).

**67.** 544 F.2d 407 (9th Cir. 1976).

**68.** *Id.* at 411.

**69.** *United States v. Baker*, 577 F.2d at 1149 & n. 3; *Weeks v. Estelle*, 531 F.2d 780, 783 (5th Cir. 1973); *Gonzales v. Beto*, 425 F.2d 963, 969 (5th Cir.) *cert. denied*, 400 U.S. 928, 91 S.Ct. 194, 27 L.Ed.2d 189 (1970).

**70.** *United States v. Burke*, 517 F.2d 377, 380 & n. 2 (2nd Cir. 1975); *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972).

**71.** · *See* notes 76–89 *infra* and accompanying text.

(iii) [I]n September of 1977, Kathleen Marria called the chemical company located in Michigan.

(iv) [I]n addition, in August of 1976 Kathline Marria was arrested by local police in Oakland County and found to be in possession of a quantity of PCP.[72]

The first and most obvious difficulty with the first three averments is that they all involve corroboration of innocent conduct, although they could fairly be said to arouse suspicion in light of the tip. In this regard, the Court may have had real difficulty in justifying the Complaint on the basis of these corroborative statements in the absence of a prior determination that the Magistrate could have found the affidavit-complaint sufficient under *Aguilar's* two-pronged test.[73] However, given that it has been determined that the Magistrate could have found *Aguilar* satisfied, these averments can only be viewed as buttressing the ultimate conclusion that probable cause existed. Therefore, the Court need not venture into uncharted regions and determined when, under the case law of this Circuit discussed above,[74] corroboration relating to innocent activity can resurrect a defective tip above the floor of minimum probable cause standards.

As to the fourth averment regarding Defendant Marria's arrest in 1976 for possession of PCP, the law has established that the affiant's knowledge of a Defendant's reputation can properly be considered by the Magistrate.[75] Additionally, having sanctioned the possibility that the Magistrate would have concluded that the affidavit satisfied *Aguilar's* two-pronged test, such a corroborative averment (like the other three) simply buttresses a finding of probable cause. This same principle would also abort any argument made by the three Defendants not mentioned in the four averments; namely, that the corroborative facts relate to only three of the six Defendants arrested pursuant to the Complaint.

Having tediously inspected the Complaint in question, the Court now comes to what it believes to be the lodestone principle in law that justifies the result of denying the motion to invalidate the arrest warrants. Throughout the opinion, the Court has made deliberate reference or allusion to what the Magistrate could reasonably have done, or to the fact that the Magistrate's actions could not be considered arbitrary.[76] These references were made in recognition of case law in this Circuit which circumscribes the role that a Court must play when reviewing a warrant, search or arrest, upon which a Magistrate has already passed. Concerning such matters, the law compels restraint and mandates a limited, even a myopic,[77] scope of review.

The Sixth Circuit recently reversed a District Court decision which invalidated a warrant that had been issued by a Magistrate in *United States v. Hatfield*.[78] The Court began by citing *United States v. Ven-*

---

**72.** Complaint.

**73.** In *Spinelli*, the tip was considered clearly defective under *Aguilar*. The Government attempted to argue that the tip was salvaged by reference to their surveillance of the Defendant's seemingly innocent conduct which was considered suspicious in light of the tip. In response, the Court said:

> The Government claims that the informant's tips gives a suspicious color to the F.B.I.'s reports detailing Spinelli's innocent seeming conduct and that, conversely, the F.B.I.'s surveillance corroborates the informant's tip, thereby entitling it to more weight . . . We believe, however, that the "totality of circumstances" approach taken by the Court of Appeals paints with too broad a brush.

> Whereas here the informer's tip is a necessary element in finding of probable cause, its proper weight must be determined by a more precise analysis.

*Spinelli v. United States*, 393 U.S. at 415, 89 S.Ct. at 588.

**74.** *See* notes 54–66 *supra* & accompanying text.

**75.** *United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (Opinion of Burger, J.); *United States v. Holmes*, 594 F.2d 1167, 1170 (8th Cir. 1979).

**76.** *See* notes 26, 38, 44 and 71 *supra* & accompanying text.

**77.** *See* note 89 *infra* & accompanying text.

**78.** 599 F.2d 759 (6th Cir. 1979).

*tresca*,[79] emphasizing two principles of review of affidavits for warrants. (1) The affidavit "must be tested and interpreted by magistrates and courts in common sense and realistic fashion."[80] (2) "The Courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common sense manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded warrants."[81] The citation of these principles from *Ventresca* set the stage for the Court to reiterate that great deference should be shown to the Magistrate's conclusion of probable cause.

> This court has on a number of occasions applied the above principle and in each instance we have consistently held that great deference should be accorded a magistrate's determination of probable cause.[82]

The Court then went on to flesh out, and apply, a standard of review as to how abstract notions of deference should be particularized.

> We stated in *United States v. Giacalone*, 541 F.2d 508, 513–14 (6th Cir. 1976): "once a magistrate has found probable cause and issued a warrant, his judgment is conclusive unless arbitrarily exercised".[83]

Finally, the Court unambiguously communicated to District Judges that they were not to substitute their own judgment for that of the Magistrate's.

> It may be that these alternative readings of the affidavit are equally reasonable, but it is neither our nor the district court's function as reviewing courts to substitute our interpretation of the facts in the affidavit for that of the magistrate.[84]

The deference to be accorded Magistrates is not a rule peculiar to this Circuit.[85] The primary rationale for such deference lies in the belief that once the Magistrate acts upon the warrant, the Fourth Amendment is presumptively satisfied. To insure against general warrants and writs of assistance, the Framers of the Fourth Amendment required warrants be issued only by

**79.** 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

**80.** *Id.* at 108, 85 S.Ct. at 746; *United States v. Hatfield*, 599 F.2d at 761.

**81.** *United States v. Ventresca*, 380 U.S. at 109, 85 S.Ct. at 746; *United States v. Hatfield*, 599 F.2d at 761.

**82.** *United States v. Hatfield*, 599 F.2d at 761.

**83.** *Id.* The Court, *id.* at 761 n. 3, also cited the following cases dealing with this standard of review:
> *United States v. Barone*, 584 F.2d 118 (6th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979); *United States v. Swihart*, 554 F.2d 264 (6th Cir. 1977); *United States v. Dudek*, 560 F.2d 1288 (6th Cir. 1977), *cert. denied*, 434 U.S. 1037, 98 S.Ct. 774, 54 L.Ed.2d 786 (1978); *United States v. Giacalone*, 541 F.2d 508 (6th Cir. 1976); *United States v. Rosenbarger*, 536 F.2d 715 (6th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *United States v. Sevier*, 539 F.2d 599 (6th Cir. 1976); *United States v. Hodge*, 539 F.2d 898 (6th Cir. 1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536

(1977); *United States v. Moore*, 452 F.2d 569 (6th Cir. 1971), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2435, 32 L.Ed.2d 684 (1972).

**84.** *Id.* at 762.

**85.** *See e. g., United States v. Middleton*, 599 F.2d 1349, 1356 & n. 7 (5th Cir. 1979); *United States v. Rasor*, 599 F.2d 1330, 1332 (5th Cir. 1979); *United States v. Allen*, 588 F.2d 1100, 1106 (5th Cir. 1979); *United States v. Del Valle*, 587 F.2d 699, 702 (5th Cir. 1979); *United States v. Fried*, 576 F.2d 787, 791–92 & n. 2 (9th Cir. 1978); *United States v. Brinklow*, 560 F.2d 1003, 1006 (10th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978); *United States v. Bowers*, 534 F.2d 186, 188–90 (9th Cir. 1976); *Mapp v. Warden*, 531 F.2d 1167, 1171–72 (2nd Cir. 1976); *United States v. Olsen*, 487 F.2d 77, 82 (8th Cir. 1973), *cert. denied*, 415 U.S. 993, 94 S.Ct. 1594, 39 L.Ed.2d 890 (1974); *United States v. Fuller*, 441 F.2d 755, 759–60 (9th Cir. 1971), *cert. denied*, 404 U.S. 830, 92 S.Ct. 73, 30 L.Ed.2d 59 (1972). *See also Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959).

neutral Magistrates. To protect the privacy of citizenry from potential abuse of the power granted the Government, the Constitution interposes a neutral judicial officer. He/she is to accept or reject the legitimacy of the Government's claim that the exercise of its power, having intrusive consequences, is indeed warranted. Whenever a magistrate acts upon a request for a warrant, the protective machinery designed by the Fourth Amendment is utilized.[86]

It is reasoned that to permit reviewing courts to invalidate warrants already passed upon would inhibit an efficient working of this Constitutional design.[87] Law Enforcement Officers would become discouraged and dissuaded from seeking warrants. The best method, with which, to encourage officers to request a warrant, is to grant them their request whenever the question of issuance is close, and to sustain

the warrant (absent its being arbitrarily issued) once granted.[88]

It would be difficult to conceive of a clearer definition of this Court's role in reviewing the sufficiency of warrants than that which appears in *Hatfield*. Absent arbitrariness, the warrants must stand, and arbitrariness is a difficult thing to show. I have discussed a legion of problems ancillary to the Complaint-affidavit here. In each instance of difficulty addressed, I have attempted to ascertain how the Magistrate may have determined that such problems were alleviated by other facts or considerations or, at least, were not insurmountable. I have attempted to see the Complaint-affidavit as he must have seen it, in order to reach the ultimate conclusion that it was sufficient. I have done this because *Hatfield* mandates such.

In view of the scope of review afforded me,[89] I cannot say that the Magistrate acted

---

86. Cf. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (referring to Warrant Clause as the bulwark of the Fourth Amendment).

87. See *United States v. Hatfield*, 599 F.2d at 761. Cf. *Franks v. Delaware*, 438 U.S. at 180–88, 98 S.Ct. 2674 (Rehnquist, J., dissenting) (expressing distaste for collateral attacks upon determinations of Magistrates regarding probable cause—especially when ground of attack is the alleged falsification of averments in an affidavit).

88. See *United States v. Hatfield*, 599 F.2d at 761.

89. I would like to note that the arbitrary standard gives credence to the argument that collateral attacks upon the conclusions of Magistrates should never be allowed. See *Franks v. Delaware*, 438 U.S. at 184–85, 98 S.Ct. 2674 (Rehnquist, J., dissenting). This seems especially true as to collateral attacks made in the District Court. The question of determining arbitrariness in the issuance of a warrant is as easily considered by the Court of Appeals as by the District Court. Indeed, it is the same question. *United States v. Hatfield*, 599 F.2d at 762.

The only advantage to District Court review, given such a standard, seems to relate to a situation where it is obvious that a warrant was issued arbitrarily. If the District Court was not allowed to pass upon such a warrant and suppress its products, then a retrial would be necessary after the Court of Appeals held the warrant arbitrarily issued (since the District Court would have had to admit its products at trial).

Militating against such an advantage, however, are those disadvantages, which arise in a vast majority of cases. In a case, like this one, where the warrant is troubled with defects, deciding whether the Magistrate acted arbitrarily by issuing the warrant over such defects, is a difficult task. See e. g., *United States v. Bowers*, 534 F.2d 186, 190 (9th Cir. 1976).

What one Judge considers arbitrary may vary greatly from what another considers such to be. What appears to be arbitrary to one, may appear permissible to another. However, this would seem to be the case whenever, and in whatever context, that standard is utilized. The difficulty which the standard poses in the warrant sufficiency context, is that the District Court must serve a soothsayer or seer function to avoid reversal. Since the Court of Appeals must also apply this (perhaps undefinable) standard, the District Court, to act without error, must anticipate what the higher court will characterize as arbitrary. Ascertaining what another considers to be unreasonable or arbitrary is a most difficult, if not impossible task. Cf. *Plessy v. Ferguson*, 163 U.S. 537, 550–51, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). (Seven members of the Supreme Court held that it was not unreasonable or arbitrary for the State of Louisiana to require persons of different races be separated when using public conveyance).

Another factor militating against the singular advantage to intermediate review relates to the expanded right of appeal that Congress granted to the Government when it amended 18 U.S.C. § 3731 (1975) in 1971. Pub.L. 91-644 Tit. III, § 14(a)(1), 84 Stat. 1890. Section 3731, as

unreasonably or arbitrarily when he concluded that the Defendants had *probably*

conspired to manufacture PCP. The very nature of conspiracy, and the difficulty of

amended, permits the Government to appeal pretrial suppression orders. Consequently, if an order to suppress is granted by the District Court, because it believes a warrant(s) was improperly issued, the Government may appeal immediately. Such action, of course, will stay further proceedings until the Court of Appeals has disposed of the appeal, and regardless of whether they reverse or affirm, a considerable amount of time will have passed before disposition. *See, e. g., United States v. Hatfield,* 599 F.2d 759.

On the other hand, if the District Court denies the Suppression Order but the Court of Appeals determines the Magistrate did act arbitrarily in issuing the warrant, retrial will be necessary. *See United States v. Rasor,* 599 F.2d 1330, 1332 (5th Cir. 1979) (Retrial not necessary there because Court concluded that the conviction, absent items that had to be suppressed, could not be sustained, and, therefore, entered judgment of acquittal).

These disadvantages point out that there is only a limited advantage to District Court review, when the scope of review affords only a minimal benefit to the state of the law and the effective administration of justice. Justice Rehnquist utilized similar reasoning when he argued that an affidavit for a warrant should never be able to be collaterally attacked because it was intentionally falsified. *Franks v. Delaware,* 438 U.S. at 185–86, 98 S.Ct. 2674 (Rehnquist, J., dissenting) (Ex Parte application for warrant sufficient context to decide falsification issue. Only a limited degree of benefit to ascertaining "truth" when collateral attack permitted which causes great disruption in the finality of the judicial determination).

I do not cite this reasoning to suggest that I support it, or that I would support the eradication of the District Court review of warrant sufficiency questions. Far from it. Rather, I have cited this reasoning because I think it must necessarily be sustained if the arbitrary standard of review is utilized. Embracement of the arbitrary standard necessarily renders District Court review of nominal value. In the words of Justice Rehnquist, one wonders if "the game is worth the candle." *Id.* at 186, 98 S.Ct. at 2692. Precisely because adoption of the arbitrary standard buttresses this reasoning, I take exception with the standard.

As indicated above, *see* notes 86–88 *supra* & accompanying text, deference to a Magistrate's determination of probable cause is constitutionally predicated on the notion that once the police request a warrant and such is granted, the bulk of Fourth Amendment concerns are satisfied because a neutral Magistrate has been interposed between the Government and the citizenry. Be as it may, however, that the bulwark of the Fourth Amendment is the warrant clause, that Amendment, indeed that

clause, provides "no warrant shall issue, but upon probable cause." A literalistic interpretation of that language would, of course, result in the invalidation of a warrant whenever the District Court (or the Court of Appeals) believed that, in a strict or objective sense, probable cause did not exist.

In recognition of the many concerns discussed above, *see* notes 37, 38, 76–88 *supra* & accompanying text, the Courts have quite reasonably refrained from such literalism and afforded the Magistrate considerable latitude. However, at least in theory, I do not believe that the courts have, by doing this, sacrificed the absolute tenor of the language of the Constitution by showing such deference. Ascertaining the existence of probable cause is often a difficult job, involving the subjective evaluation of evidence or other facts and assessing whether probabilities preponderate toward cause. Although these subjective (and often subtle) tasks mandate latitude be given the Magistrate, it is my belief (perhaps naive) that there is an ascertainable and objective presence (or absence) of probable cause in any given search or arrest problem. If such was not the case, Fourth Amendment problems would not be amenable to analysis under the rule of law—the cases would be only a collage of fact-specific determinations, ungoverned by any overarching principles.

I think that adoption of the extreme deference inherent in the arbitrary standard of review may well result in an undesirable sacrifice of the search for an objective presence of probable cause in any given case. Such a sacrifice could well result in an unhealthy blurring of the case law, in an area already plagued by inconsistency. Because review of a warrant will be inextricably tied to a determination of whether or not the Magistrate's actions were arbitrary, the cases decided under the arbitrary standard will have limited precedental value. Additionally, it would appear that, for review and precedental purposes, the very definition of probable cause will be tied to the actions of the Magistrate as well as to the facts averred in the affidavit.

I think the better standard is simple deference. A given District Judge, under that standard, would be able to show permissible latitude to various Magistrates. Some Magistrates, who possibly serve a rubber stamp function for the Government, may be deserving of greater scrutiny than others, and the deference standard would certainly permit the District Court to correct such wrongs. The arbitrary standard arguably would not. In the event a District Court seeks to "fly speck" warrants or reads them hypertechnically, the Court of Appeals can adequately deal with that problem under the deference standard.

proving it, further insulate the Magistrate's conclusion from disruption.

In finding an absence of arbitrariness, I should not be read as placing my imprimatur on this Complaint and warrant. Far from it. The Complaint is fraught with substantial defects, all of which I have attempted to highlight and discuss. Indeed, if it had been presented to me, in all likelihood, I would have turned the officers away.

### WASHBURN SEARCH WARRANT

■ The Court now turns to the question of the search warrants and appertaining affidavits. At oral argument, the moving Defendants requested that any evidentiary hearings to be held be put off until after the Court had ruled on the sufficiency of the arrest and search warrants on their face. Given the ruling made with respect to the sufficiency of the arrest warrants, and given the facts that were put into dispute by the Defendants' affidavits, the Court believes an evidentiary hearing is necessary to resolve some of the problems surrounding the search warrants.

The moving papers and affidavits of Defendants Stephenson, Courech and Marria fairly raise, in the mind of the Court, a question of whether the arresting officers complied with the requirements of 18 U.S.C. § 3109 (1975) when the warrant was executed. That statute provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refus-

ed admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.[90]

Although an officer who has a valid right to enter premises when he has reasonable belief that the person to whom the warrant is directed is within,[91] the statute imposes limitations on that right.[92]

In *United States v. Murrie*,[93] the Sixth Circuit held that when there is a *prima facie* showing that there has not been compliance with the statute, the burden shifts to the Government to justify the execution of the warrant.[94] The Defendants have not cited 18 U.S.C. § 3109 and, therefore, the Court makes no determination as to whether they have made a *prima facie* showing of its violation. However, the Court believes the arguments made by, and the affidavits of, the Defendants require that we address the potential applicability of the statute at an evidentiary hearing. This is necessary because the Sixth Circuit has stated that even when an officer is acting pursuant to a lawful arrest warrant, an entry which does not comply with 18 U.S.C. § 3109 can constitute an unconstitutional search.

We believe that § 3109's conditions for forcible entry—(1) announcement of authority, (2) announcement of purpose, and (3) grounds for believing entry has been refused—are statutory conditions which explicate fundamental purposes of the Fourth Amendment. Even if police officers possess a wholly lawful warrant for arrest or search, we believe the sudden, unannounced breaking of a dwelling, particularly in the nighttime, may not only violate the statutory terms of § 3109 but

---

My comments here are not an attempt to rationalize away application of the *Hatfield* decision or the arbitrary standard. *Hatfield* makes that standard the law, and I have followed it religiously in this case. I only point out that, as long as the arbitrary standard is utilized, the value of intermediate collateral review of warrant sufficiency in the District Court is of nominal benefit.

**90.** 18 U.S.C. § 3109 (1975).

**91.** *See e. g., United States v. Brown*, 151 U.S. App.D.C. 365, 370, 467 F.2d 419, 424 (D.C.Cir. 1976).

**92.** The language of the statute speaks of search warrants but it has been held applicable to arrest warrants as well. *Sabbath v. United States*, 391 U.S. 585, 588, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *United States v. Kulcsar*, 586 F.2d 1283, 1285–86 n. 2 (8th Cir. 1978); *United States v. Murrie*, 534 F.2d 695, 697 (6th Cir. 1976).

**93.** 534 F.2d 695 (6th Cir. 1976).

**94.** *Id.* at 697–98.

also the "unreasonable" search standard of the Fourth Amendment.[95]

In *Murrie*, the issue related to the suppression of a gun. The arresting officers discovered the gun on a living room couch, after they had entered by kicking in the front door.[96] A similar problem may exist here.[97] The search warrant issued for the Washburn address was issued under the predilection that Agent Mueller had lawfully entered the Defendant's home when he observed, in "open view," the chemical precursors and the leafy substance appearing to be marijuana. If he was able to see these items (arguendo they were in plain view) only because of an unconstitutional entry, then the "plain view" search, as well as the warrant obtained on the basis of the "plain view" averment, would necessarily be imperishably tainted.[98]

**95.** *Id.* at 698.

**96.** *Id.* at 696–97.

**97.** The affidavit of the Defendant Courech avers that between 7:30 a. m. and 8:00 a. m. of August 9, 1978, she was awakened by the sound of the Washburn door being broken. She got up, and when she was trying to put on a robe, a policeman burst into her room, pointed a gun at her, and told her to put her hands up. The affidavit further reads that there were ten to twelve officers (with bullet proof vests on) looking about the house, looking into closets, through papers, etc. The affidavit continues to state there was no marijuana or paraphernalia present in her room in open sight.

The affidavit of Defendant Stephenson indicates that he was arrested and taken to the living room after being handcuffed. It also states no paraphernalia or drugs were in open view at that time.

In her affidavit, Defendant Marria related the following: At about 3:45 a. m., on August 9, 1978, she heard cars pull into the driveway and saw, from her bedroom windows, that the police had arrived. The officers ran up to the door pounding and screaming "Police, Open up." She then screamed out the windows, "I'm coming—I'm coming" while trying to pull on a pair of pants. She then heard the door bust open, and she dropped her pants and tried to get a T-shirt. She had just grabbed her T-shirt when an agent busted into her room and said "put your hands up against the wall." She then tried to cover herself by holding the T-shirt in front of her, but the command was reiterated. She then turned around, put on her shirt, and placed her hands against the wall. She was then taken to the living room where agents were opening hallway closets, going through materials on a secretary, roaming around in the basement, garage and also about the outside parts of the house. She further stated absolutely no marijuana or paraphernalia was visible in the living room area.

The affidavits raise a question about whether there was any announcement of authority, although the Marria statement does indicate that the officers yelled "Police—Open up." More importantly, the affidavits indicate that there was no announcement of purpose. Most critical, however, is the question of whether there were reasonable grounds to believe that the Defendants refused the officers' entry. This is an especially compelling question of fact because the affidavit of Marria, if believed, establishes that almost no time elapsed between the announcement of authority and the breaking down of her bedroom door (with the breaking of the residence door occurring between these two events). *See United States v. Murrie*, 534 F.2d at 697. The Court, therefore, must hear all the evidence concerning these matters in order to make a factual determination (as to just what happened) upon which a legal conclusion can be founded.

Also, the affidavits bring into purview the necessity of making a factual determination if the search incident to arrest was within the permissible scope of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1968), notwithstanding Agent Mueller's characterization of the items seized as being in "open view" in the search warrant affidavit. *See* note 98 *infra*. Such factual determinations are of course integrally related to a determination as to whether such an averment was made with knowledge of the falsity or in reckless disregard of the truth. Therefore, the Court will consider such allegations of the Defendants at the same hearing it inquires into the matters already discussed.

**98.** The Court would note that absent ¶ 2 of the affidavit in support of the search warrant (the averment regarding what was seen by Mueller when the arrest warrants were executed), the affidavit relates facts substantially similar to those outlined in the Complaint. All that document did was establish that there was probable cause to believe that the Defendants conspired to violate the Controlled Substances Act. There was no reason to believe from the face of the Complaint (or the affidavit in support of the Washburn warrant absent ¶ 2), that there was probable cause to believe the Defendants had narcotics, or other evidence of unlawful activity, harbored in their home. Put another way, there was no probable cause to search the Washburn residence for narcotics, narcotics paraphernalia, etc. before the arrest warrants were executed. That a person's home does not become the subject of a general search simply

Despite the factual determinations that must yet be resolved in order to fully consider all the Fourth Amendment problems in this case, the Court still has to decide the narrow issue relating to the sufficiency of the two search warrants on their face. Because the narrow question presented does not permit the Court to look outside of, or beneath, the face of the affidavit, we must accept the characterization of Agent Mueller in the affidavit that the precursors and marijuana were in plain view.[99] Additionally, we must assume that the police did not violate 18 U.S.C. § 3109 when they executed the arrest warrants, there being a presumption regarding the propriety of police conduct.[100] These assumptions were imposed upon Magistrate Kraphol when he looked at the affidavit, and, therefore, we must do likewise in reviewing his determination of probable cause.

Given these assumptions, the Court can only state that the admissibility of the evidentiary proceeds of the search warrant are tied to the legality of the arrest. A case recently decided by the Second Circuit, involving similar facts, is illustrative of this.

In *United States v. Broward*,[101] the Second Circuit reversed the District Court's suppression of evidence obtained from a search warrant. In that case, agents had an arrest warrant for the Defendant Forbes. After being arrested, Forbes requested that he be allowed to go to his apartment and inform his wife of the arrest. The agents granted this request and, of course, accompanied him there. Upon arrival at the apartment, the agents observed, from the doorway, contraband[102] within the house. They subsequently submitted an affidavit averring what they had seen in "plain view" from the doorway and sought a search warrant for the apartment. A search warrant was then issued pursuant to the affidavit.

The Court found that even if the arrest warrant was invalid, the agents had probable cause to arrest Forbes. The agents were, therefore, "lawfully on the premises" of Forbes, and, hence, the plain view doctrine was clearly operable when they saw the contraband from the doorway.[103] Consequently, the search warrant predicated upon what the agents saw was clearly sufficient.

A similar type of analysis would apply to affidavit for the search warrant at Washburn Road.[104] From the face of the

because there is probable cause to arrest him, underlies the Supreme Court's determination that searches incidental to arrest must be limited to the area from which the arrested person might obtain weapons or other evidentiary items. *Chimel v. California*, 395 U.S. 752, 763–66, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1968). That the arresting officer expects to find evidence at a particular place is irrelevant to determining if the search is constitutional. *United States v. Hare*, 589 F.2d 1291, 1294 (6th Cir. 1979).

**99.** This circumscription in review of the affidavit is self imposed in view of the fact that the Court intends to conduct a *Franks v. Delaware* hearing. The Court, therefore, need not decide whether, absent a hearing, it would be required to accept the averments of the affidavit as true. Compare *Franks v. Delaware*, 438 U.S. at 171, 98 S.Ct. 2674; *United States v. Garcia*, 593 F.2d 77, 79–80 (8th Cir. 1979); *United States v. Rettig*, 589 F.2d 418, 422 (9th Cir. 1978); with, *United States v. Garcia*, 593 F.2d at 81 and n. 1 (Heaney, J., dissenting).

**100.** *See, e. g., United States v. Murrie*, 534 F.2d at 697; *United States v. Wright*, 468 F.2d 1184 (6th Cir. 1972).

**101.** 594 F.2d 345 (2nd Cir. 1979).

**102.** "[M]arijuana, cutting and packaging material, all laying in plain view." *Id.* at 350.

**103.** *Id.* at 350. The Court cited *United States v. Berenguer*, 562 F.2d 206, 210 (2nd Cir. 1977), construing *Coolidge v. New Hampshire*, 403 U.S. 443, 464–71, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion).

**104.** This Court would hasten to point out that the result in *Broward* was premised on an important proposition questioned in the context of this case.

Appellees challenge neither the reasonableness of the agent's conclusion that the contraband was in plain view nor his good faith belief as to what he saw, and therefore do not question that there was apparently probable cause for issuance of the search warrant. *United States v. Broward*, 594 F.2d at 350. Here, there is an explicit challenge to the reasonableness of Agent Mueller's conclusion that the items mentioned in ' 2 of the affidavit to the search warrant for the Washburn residence were in plain view. Defendants also challenge

affidavit, the Magistrate knew that Mueller had been to the Washburn residence to execute arrest warrants for violations of the Controlled Substances Act. He also knew that, while there, Mueller saw what he thought to be marijuana and also precursors to the manufacture of PCP, and that such items were in plain view. Given such information, there was more than ample room for the Magistrate to conclude that "narcotics, narcotics paraphernalia, books, records, glassware, precursors relative to the manufacture of phencyclidine and other controlled substances" were *probably* located at the Washburn residence. His actions not having been arbitrary, the Court must sustain the sufficiency of the warrant as determined from the face of the affidavit.

## DORT HIGHWAY STORAGE BIN SEARCH WARRANT

Since Mueller found that Janet Barber license while lawfully executing the search warrant for the Washburn residence, it certainly was permissible for him to utilize it in following up a suspicion. When he discovered that a Janet Barber had rented a storage bin and that such a bin smelled of chemicals, his suspicion was transformed and elevated into a sustainable probable cause belief that incriminating evidence was secreted in the bin.[105]

The Court, as indicated below, will conduct an evidentiary hearing regarding the factual and legal issues which are still to be resolved.

The Court, therefore, DENIES the Motion of the Defendants Courech, Stephenson and Marria, attacking the sufficiency of the

## APPENDIX 1

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN—SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Magistrate's Docket No. |
| v | Case No. 8–80590 |
| WILLIAM STEPHENSON, KATHLINE MARRIA, WENDY COURECH, TIMOTHY GREENING, ROBERT ARCHIE VUKSON, and RUDOLPHO LONGO | COMPLAINT FOR VIOLATION OF U.S.C. Title 21 Section 841(a)(1) and 846 |

BEFORE HONORABLE CHRIS E. STITH

10th Floor Federal Building, Detroit, Mi.

---

his good faith making this averment. As mentioned before, the Court presumes the reasonableness of the conclusion in ¶ 2 of the affidavit, as well as the good faith of the Agent who made it, for the limited purpose of ruling on the sufficiency of the facts averred on the face of the affidavit to the search warrant. The Court utilizes the reasoning of *Broward,* therefore, for this limited purpose. The more expansive problems related to the allegations which challenge reasonableness and good faith can only be resolved in the *Franks v. Delaware* hearing.

**105.** This determination does not negate the possibility that items seized pursuant to this warrant could be suppressed upon findings of fact and resultant legal conclusions made in light of the hearing to be conducted. The Court's analysis regarding this warrant is similar to the limited inquiry regarding the Washburn warrant. *See* notes 97 & 98 *supra* & accompanying text.

various warrants and affidavits on their face.

The undersigned complainant being duly sworn states:

That on or before early 1975, and continuing thereafter up to and including the present in the Eastern District of Michigan—Southern Division WILLIAM STEPHENSON, KATHLINE MARRIA, WENDY COURECH, TIMOTHY GREENING, ROBERT ARCHIE VUKSON, and RUDOLPHO LONGO, defendants herein, did wilfully, knowingly and unlawfully combine, conspire, confederate and agree together, and with each other and with diverse other persons to commit offenses against the United States of America, that is knowingly, wilfully and unlawfully to possess with intent to distribute, to distribute and to manufacture or attempt to manufacture phencyclidine, a Schedule III, Controlled Substance; in violation of Sections 841(a)(1) and 846, Title 21, United States Code.

In furtherance of said conspiracy and to effect thereof, the defendants and co-conspirators committed the following overt act:

1. On or about August 29, 1976 defendant and co-conspirator Kathline Marria possessed a quantity of phencyclidine near South Lapeer and Harmon roads in Oakland County, Michigan.

And the complainant states that this complaint is based on the fact that the above information was supplied to the Drug Enforcement Administration by cooperating individuals, and through the surveillance efforts of agents of the Drug Enforcement Administration and other police agencies from 1975 to the present. A cooperating individual overheard conversations between all defendants except Robert Archie Vukson detailing an agreement between defendants and their accomplices to build and operate an illicit laboratory designed to produce phencyclidine and located in the proximity of 841 Lake George, Oxford, Michigan. A cooperating individual observed the actual lab being constructed and operated in 1975–1976 at that location by William Stephenson, Kathy Marria, Wendy Courech and Timothy Greening. A cooperating individual later observed the lab being dismantled intact and prepared for transportation to another location. A cooperating individual heard the defendants state their intention to continue production of PCP. All the cooperating individuals have supplied agents of the Drug Enforcement Administration with intelligence concerning the above conspiracy and background on the individuals involved such as residences, vehicle ownership and use, criminal records, meetings between individuals, and the identity of their associates. This information has been independently corroborated through governmental agencies and found to be true. None of the cooperating individuals were involved, to the knowledge of the affiant, in the criminal enterprise alleged. The cooperating individuals are ordinary citizens who have been questioned by affiant. None of the cooperating individuals are "Professional tipsters" or members of the "criminal milieu". In addition, surveillance by agents of the Drug Enforcement Administration from 1975 to the present has established the following: that in Detroit, March, 1975, Rudolpho Longo purchased large quantities of known chemical precursors to the production of PCP; in June of 1976, Robert Archie Vukson and Rudolpho Longo purchased and transported large quantities of chemical precursors from Chicago to Detroit, and that in September of 1977, Kathline Marria called a chemical company located in Michigan. In addition, in August of 1976, Kathline Marria was arrested by local police in Oakland County and found to be in possession of a quantity of PCP. The complainant bases the above on his personal knowledge and expertise as a Special Agent for the Drug Enforcement Administration, and upon personal conversation with all the above-noted Confidential Informants, Special Agents of the Drug Enforcement Administration and local police.

And the complainant further states that he believes that the undersigned are material witnesses in relation to this charge.

/s/
s/a Honorable Chris E. Stith
United States Magistrate

/s/
s/a Patrick Mueller
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence, August 8, 1978.

APPENDIX 2

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF MICHIGAN—SOUTHERN DIVISION

UNITED STATES OF AMERICA

vs.

6297 WASHBURN ROAD
GOODRICH, MICHIGAN

BEFORE Warren F. Krapohl

Case No. 8–80590

AFFIDAVIT FOR SEARCH WARRANT

601 S. Grand Traverse, Flint, Mi. 48502

The undersigned being duly sworn deposes and says:

That he has reason to believe that (on the premises known as) 6297 Washburn Road, Goodrich, Michigan, a single family, one story dwelling with basement, said dwelling having a white aluminum front with red brick on bottom, black shutters on front windows, attached two car garage on rear of building, black roof on entire dwelling, numbers 6297 on southeast corner of the residence and any and all other outbuildings, namely, one brown wooden 2-car garage structure located east of the driveway and southeast of the above-described premises and an additional smaller red wooden shed located northeast of the above-described property, said dwelling is the first house east of 6291 Washburn Road, Goodrich, Michigan, located on the southeast side of Washburn Road, Goodrich, Michigan, access to residence being controlled by a private dirt driveway on the southeast side of dwelling, left of the driveway as you enter the dirt road is a large rock, painted white with black numbers 6297. For additional description see attached photograph to original warrant there is now being concealed certain property, namely narcotics, narcotics paraphernalia, books, records, chemicals, glassware, precursors relating to the manufacture of phencyclidine and other controlled substances, which are in violation of Title 18 [sic], U.S.C. § 841(a)(1).

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

Being first duly sworn deposes and says:

1) That he is an agent of the Drug Enforcement Administration and has been so employed for the past three years.

2) That upon execution of arrest warrants at 6297 Washburn Rd. Goodrich, Michigan on 8–9–77 at approx. 8:00 a. m. for William Stephenson, Wendy Courech and Kathline Marria, the following items were observed by the affiant in open view:

1. Plastic baggie containing a green leafy substance believed to be marijuana, located on a desk in the living room area.

2. Two packages of "JOB" cigarette papers commonly used for the rolling of marijuana cigarettes, located on the kitchen counter.

3. One box labeled "Mallinkroor Ethyl Ether Anhyrons" a common precursor in the processing of Phencyclidine a Schedule II controlled substance, located on a shelf of a metal storage rack in the family room.

4. One 5-gallon can of Ethyl/Ether Anhydrons labelled T. T. Baker Co., a common precursor in the processing of Phencyclidine located in the garage of the house.

4. Based on information supplied by Confidential Informant, Special Agent Mueller has knowledge that William Stephenson, Wendy Courech and Kathline Marria have built and operated an illicit laboratory designed to produce PCP, at 841 Lake George Rd., Oxford, Mich. and that this laboratory was dismantled in 1975 and transported to another location.

5. That in 1968 William Stephenson was arrested and convicted on a charge of illicit manufacturing MDA a controlled substance, by the Drug Enforcement Administration.

6. That Confidential Informants have supplied Agent Mueller with intelligence concerning an ongoing criminal conspiracy involving the manufacture of illicit drugs involving use of vehicles, residences, criminal records, meetings, conversations and identity of associates. This information has been independently corroborated through governmental agencies and found to be true.

7. That in March 1975, January 1976, May 1976, Sept. 1976, May 1977, June 1977, September 1977, March of 1978, William Stephenson, Wendy Courech, Kathy Marria, and two criminal associates Rudy Longo and Robert Vukson, participated in the ordering, pick up and transportation of large quantities of chemical precursors from chemical firms throughout the United States. The information was gathered by agents of Drug Enforcement Administration, through surveillance interviews with private businessmen and review of business.

8. That in August of 1976 Kathline Marria was arrested by local police in Oakland County in possession of a quantity of PCP.

9. The above mentioned confidential informants have been interviewed by the affiant and are ordinary citizens, and are not involved in the criminal enterprise to the knowledge of the affiant. None of the cooperating individuals are "professional tipsters" or members of the "criminal milieu."

10. The affiant is familiar with the process of manufacture of phencyclidine and the illicit operation of clandestine laboratories as a result of his training and experience in the Drug Enforcement Administration.

/s/_____
Patrick A. Mueller
Special Agent
Drug Enforcement
Administration

Sworn to before me, and subscribed in my presence, August 9, 1978.

/s/_____
Warren F. Krapohl

APPENDIX 3

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF MICHIGAN—SOUTHERN DIVISION

UNITED STATES OF AMERICA

v

G–51805 Dort Hwy
Flint Michigan
Grand Blanc Twp
Storage Unit # A–12

BEFORE Warren F. Krapohl

Case No. 8–80590

AFFIDAVIT FOR SEARCH WARRANT

601 S. Grand Traverse, Flint, Mich. 48501

The undersigned being duly sworn deposes and says:

That he has reason to believe that on the premises known as Dort Hwy. Flint, Michigan, storage unit # A–12 located in Grand Blanc Twp, and further described as a 5′ x 15′ storage area located in the first building east of Dort Hwy at the Leisure Storage Facility in the Eastern District of Michigan there is now being concealed certain property, namely narcotics, narcotics paraphernalia, books, records, chemicals, glassware and precursors relative to the illicit manufacture of phencyclidine and other controlled substances which are in violation of Title 21 U.S.C. §§ 841(a)(1), 846.

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

Special Agent Patrick A. Mueller, Drug Enforcement Administration being first duly sworn deposes and says:

1) That he is an agent of the Drug Enforcement Administration and has been so employed for the past three years.

2) That upon execution of arrest warrants at 6297 Washburn Rd. Goodrich, Mich. on 8–9–77 at approx. 8:00 a. m. for William Stephenson, Wendy Courech and Kathline Marria, the following items were observed by the affiant in open view:

1. Plastic baggie containing a green leafy substance believed to be marijuana, located on a desk in the living room area.

2. Two packages of "JOB" cigarette papers commonly used for the rolling of marijuana cigarettes located on the kitchen counter.

3. One box labeled "Mallinkroor Ethyl Ether Anhyrons" a common precursor in the processing of Phencyclidine a Schedule II controlled substance, located on a shelf of a metal storage rack in the family room.

4. One 5-gallon can of Ethyl/Ether Anhydrons labelled T. T. Baker Co., a common precursor in the processing of Phencyclidine located in the garage of the house.

4. Based on information supplied by Confidential Informant, Special Agent Mueller has knowledge that William Stephenson, Wendy Courech and Kathline Marria have built and operated an illicit laboratory designed to produce PCP, at 841 Lake George Rd., Oxford, Mich. and that this laboratory was dismantled in 1975 and transported to another location.

5. That in 1968 William Stephenson was arrested and convicted on a charge of illicit manufacturing MDA a controlled substance, by the Drug Enforcement Administration.

6. That Confidential Informants have supplied Agent Mueller with intelligence concerning an ongoing criminal conspiracy involving the manufacture of illicit drugs involving use of vehicles, residences, criminal records, meetings, conversations and identity of associates. This information has been independently corroborated through governmental agencies and found to be true.

7. That in March 1975, January 1976, May 1976, June 1976, Sept. 1976, May 1977, June 1977, September 1977, March of 1978, William Stephenson, Wendy Courech, Kathy Marria, and two criminal associates Rudy Longo and Robert Vukson, participated in the ordering, pick up and transportation of large quantities of chemical precursors from chemical firms throughout the United States. This information was gathered by agents of Drug Enforcement Administration, through surveillance interviews with private businessmen and review of business records.

8. That in August of 1976 Kathline Marria was arrested by local police in Oakland County in possession of a quantity of PCP.

9. The above mentioned confidential informants have been interviewed by the affiant and are ordinary citizens and are not involved in the criminal enterprise to the knowledge of the affiant. None of the cooperating individuals are "professional tipsters" or members of the "criminal milieu."

**650**

10. The affiant is familiar with the process of manufacture of phencyclidine and the illicit operation of clandestine laboratories as a result of his training and experience in the Drug Enforcement Administration.

11. That on 8–9–77 at approx. 10:30 a. m. a Federal Search Warrant issued by U. S. Magistrate Warren F. Krapohl was executed on the residence at 6297 Washburn Rd. Goodrich, Michigan.

12. That during the search of the residence false identification was found in the bedroom of Wendy Courech. This identification included a State of Michigan Driver's License in the name of Janet Margaret Barber, 4260 Joslyn Rd. Pontiac, Michigan. 10th picture identified by affiant as Wendy Courech. Also found in Courech's bedroom was a calendar for 1977, with a handprinted notation on the page for August 1977, "rent due for garage on Dort."

13. That on 8–9–77 S. A. Mueller proceeded to the Leisure Storage Facility, G–5180 S. Dort Hwy, Flint, Mich. at approx. 4:00 p. m. The management was questioned as to the possibility of any renters under the names Stephenson, Courech, Marria, Kline, Longo, Vukson, or Barber. The manager stated that they did have a renter under name of Barber, and that the particular garage was number A–12. S/A Mueller proceeded to locker # A–12 where he was able to recognize a distinct chemical odor, similar to those precursors which affiant knows to be utilized in the production of Phencyclidine and other controlled substances.

14. S/A Mueller then inquired of the manager to view the particular rental agreement for that unit. Rental agreement # 193 was then produced. The agreement dated June 20, 1977 was made out in the name of Janet Barber, 4260 Joslyn, Pontiac, Michigan 48055 with Mich. D/L # B 616–368–4354 noted and no telephone number. The manager then reviewed the payment record in the presence of S/A Mueller noting that all payments were made in cash or by money order. S/A Mueller knows this to be the method of operation utilized by this criminal organization.

15. S/A Mueller further noted that the agreement showed no breaks in service from June 20, 1977 until the present and that the lease is paid in full through September 1978.

/s/_____
Patrick A. Mueller, S/A
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence, August 9, 1978.

/s/_____
Warren Krapohl
United States Magistrate

## MEMORANDUM OPINION AND ORDER

In their Motion for Rehearing, the Defendants have argued, *inter alia*, that the arbitrary standard announced in *United States v. Hatfield*, 6 Cir., 599 F.2d 759, has been improperly applied to this case.

> Defendants submit the *Hatfield* decision does not restrict the District Judge to an arbitrary standard of review when making his independent judgment relative to probable cause to find a crime has been or is being committed. Rather, the rule of *Hatfield* is to the effect that where alternative readings of an affidavit are equally reasonable, the reading given to said affidavit by the Magistrate and his conclusions therefrom, as to the scope of intrusion to be authorized, should not be disturbed absent a finding on the part of the reviewing Court of arbitrary or unreasonable action on the part of the Magistrate. The facts of *Hatfield* and the reasoning of Judge Celebrezze therein, suggests no other interpretation of *Hatfield*.

Brief in Support of Rehearing at 14.

This argument is further explained as follows:

> It is submitted that *Hatfield* should in the first instance be limited to its facts. Moreover, *Hatfield* should be viewed by the Court as limiting the scope of review of a Magistrate's determination of probable cause, the arbitrary standard, to those cases where *sufficient facts* are set forth

in the affidavit as a matter of law so as to withstand Fourth Amendment scrutiny and to where such facts give rise to more than one alternative reading of the affidavit or complaint, each of which is reasonable. That is, where sufficient facts are set forth per Fourth Amendment requirements, the reviewing Court should not substitute its own reading of those facts unless the Magistrate, in coming to the conclusion he or she came to, acted unreasonably or arbitrarily and then only as to the Magistrate's finding as to the scope and breath [sic] of the intrusion.

*Id.* at 11.

The first contention (i. e., that *Hatfield* should not be read as extending the arbitrary rule beyond the facts of that case) must clearly fail. The *Hatfield* court explicitly recognized that such a rule had often been invoked in other cases which had been previously decided by the Sixth Circuit. *United States v. Hatfield*, 599 F.2d at 76 & n. 3; Mem. Op. at 639 & n. 83. *See also, United States v. Calandrella*, 605 F.2d 236, 243 (6th Cir. 1979); *United States v. Lee*, 581 F.2d 1173, 1177 (6th Cir. 1978); *United States v. Doss*, 535 F.2d 338, 341 (6th Cir. 1976); *United States v. Arms*, 392 F.2d 300, 302 (6th Cir. 1968); *United States v. Jordan*, 349 F.2d 107, 108–09 (6th Cir. 1965); *United States v. Haskins*, 345 F.2d 111, 113 (6th Cir. 1965); *United States v. Nicholson*, 303 F.2d 330, 332 (6th Cir. 1962); *United States v. Spears*, 287 F.2d 7, 9 (6th Cir. 1971); *Evans v. United States*, 242 F.2d 534, 536 (6th Cir. 1957).

With respect to the second argument, it appears that the Defendants read the Memorandum Opinion of this Court to mean that it had determined that the second prong of *Aguilar* was not satisfied as a matter of law.[1]

Without commenting upon the Court's determination in its Memorandum Opinion that the first prong of the so-called *Aguilar* test was met in the Complaint in the instant case, Defendants submit that the Memorandum Opinion raises serious questions as to the sufficiency of the

facts and reasons given in this Complaint for "crediting the sourse of the information" in order to meet the second prong of *Aguilar.*

This Court apparently found that the facts and reasons in the Complaint relied upon to credit the informant's information with credibility were insufficient, with one exception. The Court apparently gave some credence to the assertion in the Complaint that the informant(s) were not involved in the instant offense nor part of the "criminal milieu." In making this judgment, the Court relied upon *United States v. Swihart*, 554 F.2d 264 (6th Cir. 1977). However in so relying upon *Swihart*, the Court failed to consider the fact that in that case the 6th Circuit Court of Appeals was confronted with a fact situation quite different than the one at hand.

Brief in Support of Rehearing at 13.

It is argued that the Court would have determined that the second prong of *Aguilar* was not satisfied had it not been for the utilization of the arbitrary standard. Based upon this assumed reading, it is further argued by the Defendants that the Court has inappropriately invoked the arbitrary standard in reviewing the sufficiency of the facts with respect to *Aguilar's* second time. According to this argument, (1) there must be an independent assessment of the facts by the reviewing court, (2) only after this independent assessment establishes that there are sufficient facts to warrant an objective presence of probable cause under Fourth Amendment standards does the arbitrary standard come into purview, and (3) only when the reviewing court has made this objective assessment and found the affidavit or complaint not wanting, is the scope of review restricted to arbitrariness.

This Court believes that the Defendants read *Hatfield* sensitively. *Hatfield* relied upon the reasoning of the en banc decision of the Court in *United States v. Giacalone*, 541 F.2d 508, 514–15 (6th Cir. 1976) (emphasis supplied), which fully addressed the application of the arbitrary standard.

1. No such determination was made. *See* Mem. Op. at 637 & n. 71.

In giving the Magistrate's judgment great deference, *which the law requires even in a doubtful case*, it is not the function of a reviewing court to state what elements of proof the Magistrate must consider indispensable in making his determination. There are no technical rules establishing a *quantum* of evidence necessary to support a finding of probable cause, nor are there rules requiring that the elements of a crime, or the sequential events of a crime, must be shown. The purpose of the reviewing court's inquiry is merely to determine from the facts set forth in the affidavit *and the permissible inferences to be drawn therefrom* whether the Magistrate's decision to issue the warrant was arbitrary *because the affidavit contained no information* which, if credited, was sufficient to establish probable cause.

The position of these Defendants was rejected by the *Giacalone* majority, as indicated by Judge McCree's dissent in that case.

> The cited cases used the terms "abuse of discretion" and "arbitrariness" as a shorthand way of describing the courts' obligation to determine whether the facts in the affidavit and all permissible inferences therefrom could afford the magistrate probable cause to believe that evidence of a crime would be found in the place to be searched. They do not hold that the magistrate's determination is "conclusive" and therefore immune from judicial review as suggested in the majority opinion.

*Id.* at 518 (McCree, J., dissenting).

Ironically, I express those same concerns which were discussed by Judge McCree in his dissent when I noted some of various problems which were related to the arbitrary standard. *Compare id. with* Mem.Op. at 640–641 & n. 89. My own views concerning these matters, like his, are not the law of this Circuit.

Additionally, there are two other points which deserve comment. First, the most recent application of the arbitrary standard by the Sixth Circuit fairly negates the Defendants' argument that the District Court must make an independent assessment of the facts, irrespective of any deference to the Magistrate and/or to the arbitrary standard. *United States v. Calandrella*, 605 F.2d at 243. There, the Court of Appeals reviewed specific factual allegations which appeared in a Complaint that had been used as an affidavit for an arrest warrant. In that respect, the Sixth Circuit utilized the same methodology which was used by this Court to determine whether the Complaint was sufficient under existing case law. The *Calandrella* Court deferred to the Magistrate in considering the various factual allegations.

> With regard to the information supplied by Hagan, Kaye complains that the facts on their face are innocent. . . . There is no requirement that each fact contained in a complaint itself show the existence of criminal activity, only that the sum total of all the facts established probable cause.

*Id.* at 245.

> While it would have been preferable for the complaint to provide more detail or other indicia of the reliability of this information, we believe that these statements could *properly be credited by the magistrate. See United States v. Swihart*, 554 F.2d 264, 268–69 (6th Cir. 1977).

*Id.* (emphasis supplied).

> The magistrate *could properly rely* on the existence of a pattern of false and unverifiable representations to show that it was at least reasonably probable that Kaye did in fact have knowledge of these falsities and infirmities. *See generally, United States v. Giacalone*, 541 F.2d 508, 516 (6th Cir. 1976) (en banc).

*Id.* at 245–46 (emphasis supplied).

> We believe that *the magistrate was entitled to give some credit* to the statement of objective fact that large numbers of Seven Oak CD's [certificates of deposit] were entering the country.

*Id.* (emphasis supplied).

The Court concluded by stating that "[c]onsidering the sum of the facts alleged in the complaint, we are of the opinion that the magistrate did not act in an arbitrary manner in issuing the arrest warrant for Kaye."

*Id.*

This conclusion closely parallels the one that I drew in this case. "In view of the scope of review afforded me, I cannot say that the Magistrate acted unreasonably when he concluded that the Defendants had *probably* conspired to manufacture PCP."

The Defendants place a great deal of emphasis on the following language appearing at Mem.Op. at 640–645.

In finding an absence of arbitrariness, I should not be read as placing my imprimatur on this Complaint and warrant. Far from it. The Complaint is fraught with substantial defects, all of which I have attempted to highlight and discuss. Indeed, if it had been presented to me, in all likelihood, I would have turned the officers away.

From this language, it is not a sustainable inference to conclude that I believed the Complaint lacked sufficient facts with which to sustain a finding of probable cause. The entire opinion tediously addresses each of the relevant factual allegations and, additionally, discusses the reasonableness of crediting those facts toward an ultimate determination of probable cause. Whether, or to what extent, I would credit those facts was not, and is not, at issue. *See, United States v. Giacalone*, 541 F.2d at 513 & n. 3.

Finally, a fair reading of the Mem.Op. does not support the conclusion of the Defendants that "in so relying upon *Swihart*, the Court failed to consider the fact that in that case the Sixth Circuit Court of Appeals was confronted with a fact situation quite different than the one at hand." Eleven pages and seventeen footnotes were dedicated to the problems which were related to establishing the credibility of the unidentified informant(s) in this case, or of the reliability of information provided by him/her/them. Mem.Op. 631–635 & nn. 27–44. More specifically, the Court discussed the *Swihart* decision at length, as well as the involvement of an unidentified victim in that case. Mem.Op. 633–634 & nn. 38–43.

In view of the foregoing discussion, the Motion for Rehearing is denied.